Good morning, Your Honors. May it please the Court, Kirk Kennedy for the Appellants. We believe and contend that the central issue in this case is whether my three male clients suffered a disadvantageous term or condition of their employment regarding this specific morning overtime that they were trying to get from 2001 to 2003. It's undisputed that two females received this work, this overtime opportunity. It's also true that a much older male, Larry Call, had the function for a period of time until he died and that another gentleman named Mr. McMorris, Fred McMorris actually worked the inspection ticket counter there at the Clark County Building Department in Las Vegas and did some overtime duties and functions until, at least for a period of time, it's not certain, at least from the record I've seen exactly how long he did it. It's also clear from the evidence... Isn't it right there difficult to make that a case of discrimination? The fact that one male was allowed to get it... You've already given us names of two. Well, Mr. Call was doing, actually doing this work. That was his job. So we're looking at the request to do a specific overtime function, this extra work. What we showed in the district court, and where I believe the district court got it wrong in summary judgment, was that this is a case where my clients repeatedly asked to work this function. There are three males. And I'll first address, I do want to say, this is not, in looking at everything, I'm not going to go forward and argue this is an age discrimination case. I want you, the Court, to focus solely on the Title VII gender discrimination action, disparate treatment action under Title VII, not an age discrimination claim. So under that analysis, you know, this Court has said under Ellison v. Brady that you don't look at what the motivations of the employer were, whether they're trying to save money by letting these lesser qualified females do the work. You look at the consequences, the effects of the practice itself. And the practice was one that... three men complaining about two women being allowed the job to do a job that two other men had done at different times, too. Under discrimination? Well, I'll put it to you this way. It's an overtime opportunity that certainly, as advanced by the County in the brief, my clients to the Braddocks did receive a lot of overtime hours, a fair amount of overtime hours, that Mr. Dyer did not overtime. But it is something that they should have been entitled to this opportunity, not just the two females. And as it progressed into 2003, by the time they made complaints to the Office of Diversity with the County, it's our belief that the two females, Linda Gallant and Christine Richter, were pretty much the only ones doing this overtime opportunity, even after they became building inspectors, just like my three male clients. It may not be fair, but the question under Title VII is a little more specific than that. And to establish a prima facie case, one of the things that is required is to show that the other people who they're balancing with were similarly situated. And I'm having difficulty finding the similarly situated. At the first level, they were paid less. At the second level, they had skills that your clients didn't have, secretarial skills. And then at the third level, they had experience your client didn't have. So why are they similarly situated? Because both females were training to become building inspectors. They were at a lower level than my three male clients, but they were training to become, and did become, building inspectors. And once they became building inspectors, they were still allowed this overtime opportunity, this specific opportunity, which my three male clients were not. And that's, you know, I understand under McDonnell Douglas framework. Okay, take it to the first level. There's no question that at the beginning, your clients were making more money than they were. Yes. And so they're not similarly situated. At least by pay grade. By pay grade, they're not. Okay. So then they, around long enough and under the shop agreement, they get boosted up. By that time, they have skills in training, skills that they learned that your clients would have to be trained for. That is secretarial skills, essentially. So why are they similarly situated there? Certainly anyone who does the morning ticket, it's called the morning ticket preparation, does have to receive certain training. It's not exactly brain surgery. Your clients would have to be trained. So there has to be something happen before you can be similarly situated. And then you get to the third level. By that time, they have experience that they've gained on the job. And so at that level, your clients are not similarly situated because your clients haven't had the experience. So how do you get across the prima facie case of that phase of similarly situated? They were never given the opportunity for this training, to receive this limited training. This is not a very complex task to do the morning ticket inspection. It's not like they're trained for a year and go through a bunch of classes to do it. It's very simple training. Are you taking the position that every employer must train individuals for any position that they want to hold in order to hold on to the similarly situated? Why should they, if they have a person who's already trained that's doing the work, why should the employer have to train somebody else to do the work that these people are fully doing? First of all, my clients requested to do the work. The training would have been limited for having them to do the work. And there's no reason, justifiable reason for the county to deny them this opportunity. If the county's point is to save money, well that's not, saving money doesn't justify a discriminatory animus. It doesn't justify, but we're going to save a few dollars to do that. Discriminatory animus is still missing here too, because you've acknowledged in your brief that you either present direct evidence, and I take it there's not direct evidence of discriminatory motive here. If not, then you have to have specific and substantial indirect evidence. And all we're looking at seems to be well, there were two women who were doing the job, and they continued to be allowed to do this after they became building inspectors. And the function's also been performed in the past by at least two men. How does that turn out to be specific and substantial evidence of discriminatory animus? What hint is there that, well, they're going to be allowed to do these jobs because they're female, the same jobs that these other two men did too? I mean, the point that the Braddocks and Mr. Dyer had made to me and what we advanced in the case is when they had asked to do this work, they were repeatedly denied. When it went to Ron Lynn, who was the director of the department, and he was made aware this was going on, he had an obligation as a department head if he thinks there's something happening, some sort of discriminatory action going on to investigate it, he asked Greg Franklin and Gary Haupt, two managers, to look into it. They told him there was no issue, so he dropped the issue and didn't go anywhere further with it. So how does that prove discriminatory animus? It's just one factor of the many. When you're looking at indirect evidence, you've got to piece it together, different pieces of circumstantial evidence to try and give enough to overcome, in this case, a summary judgment standard. The evidence that we've submitted, as I put in my brief, is that we believe they are qualified for the work as building inspectors. Dealing with inspection tickets is something that building inspectors do. They actually do this work, and that's something I should have brought forward. Building inspectors in Clark County, when they go out and inspect a residential or commercial site, a ticket is prepared documenting this incident or the work order and what work was done, and whether it passed inspection or not. That's exactly what building inspectors do. The ticket preparation in the morning, those morning overtime hours, it was obviously a data entry function in getting tickets prepared, but we're talking about something that this is something they normally do. They deal with these tickets on a daily basis. All my clients had requested this work and repeatedly found the door was closed to them. They did get other overtime opportunities, and, of course, we've conceded that. But it's our contention that, you know, when you look at, I've cited to Oncal v. Sundowner and also this Court's analysis in EEOC, and, you know, in that case, you have situated in EEOC, which is a totally different situation. It's a sex harassment scenario, but I believe that the thinking still applies, that this Court said back in 2005 that you can have a discriminatory situation, even though it may not be overtly sexual or gender specific. It may not be the case where you have — I mean, I've done plenty of harassment cases, and I've done some really egregious ones where, you know, the boss does something really terrible to his secretary or makes the inappropriate advance, and that's the one that's clear on his face. This is a case that is not, when you look at it, not overtly sexual or gender. Sometimes the facts say a lot, and you've got a hundred people have been hired for a given position, and all hundred turn out to be male, and there are lots of female applicants, and none of them ever get hired for it. That's a pretty strong basis for saying something is amiss. The chances of that happening on a random basis, pretty unlikely. You're talking about a position where two females are doing a function that they'd done before when they were paid less, and the same function, the same overtime has been performed in the past by two males. The fact that at a given point in time, additional males are being — are coming forward and saying, well, we want to do this, too, and they're saying, no, we're going to let the people doing it already continue to do it, the numbers are two and three and two previous males. What kind of inference can you draw from that that gender is what is driving the decision to let the two women continue to do it? I think what can only be said is the fact that the two women did continue to do it, and any other male who asked for it didn't get it. And that's the inference. Didn't any other females ask for it? There was a reference made to another female named Adele Hancock, and I don't recall whether she had received the work or not, or whether she had applied for it or not. I think the county may have information on that. So it's our position that summary judgment under an EEOC standard, EEOC versus the National Education Association, was inappropriate, that there were sufficient factors that warranted a jury determination under Title VII, and that the district court erred in that, and we ask you to overturn that. And also save the balance for rebuttal. Unless you have any other questions. Thank you. We're here to be ended. Thank you. I take it you're submitting your 1983 claims and the State negligence on the briefs. The 1983, of course, that runs concurrent with the Title VII claim. Thank you. Thank you. May it please the Court. Yolanda Givens on behalf of Clark County. It is the county's position that this was an appropriate award of summary judgment and that there were no genuine issues of material fact with regard to any of the claims by the appellants in this case. Particularly with regard to the, it sounds like counsel has conceded, with regard to the age discrimination claim, so that I'll focus at this point in time on the gender discrimination claim. Well, I don't know that it's conceded, but I'm not sure that it was argued. Okay. Well, then, in that instance, I'd like to basically say that the appellants failed to meet their prima facie elements. It is. With regard to the age discrimination claim, with regard to the four prongs, being protected class, qualified for the position, adverse employment action, and similarly situated individuals outside of their protected class were treated more favorably. It's those last two prongs that the county would argue were not met in terms of analyzing the record. In particular, I mean. Can I ask you about that? Certainly. Would you entertain a question? Certainly. Okay. I want to go back to the part of the prima facie case dealing with people similarly situated. And as we've been discussing, there are three areas that come up. And I want to talk about the second. That is the men employees asked to have this job, and the response is, I suppose, that they had skills that the men didn't have. And the briefs indicate that. As a matter of fact, one of them admitted he'd have to have some training. If we hold that under no circumstance can they get on to be on an equal footing, it seems to me that's counterproductive to what we're trying to accomplish under the Act, under Title VII. That is, why aren't they equally situated from the position of job application? If the women had a skill that the men don't, but it's a skill that can be easily learned, why aren't they the same? That is, why can't we treat the men as prepared for that job because they can be trained and do exactly what the women did? So my question to you is, aren't they really similarly situated if the only difference between the two is that the men would need some additional training which can easily be given? My response to that would be even if you concede or would allow that they were equally experienced with regard to the administration. No, no, no. I don't want you to get even if. I want you to address the question. Okay. So that I guess the question is why wouldn't the county permit the men an opportunity to obtain the experience at the ticket desk? The question is, are they equally situated if the skill the women have and the men do not have can easily be given so that they will be as skilled as the women? Why are they not equally situated? That is, what is there about that the women got the skill earlier that forbids us to say they are equally situated when the skill can easily be taught to the men? I don't know the answer to the question. That's why I'm asking it. And I'm not sure, if it pleases the Court, that the record actually supports whether or not it would be an easily obtained skill, the skill set that these women brought after their training with regard to the clerical. Well, what we know is that it was kind of a secretarial skill. It was data entry, I believe. And what we do know is at least one of the people said that they could do the job with training. So that much we have before us in the record. Correct. And so I guess my point would be that that was but one of the, what should I say, qualifications that the supervisor for that particular division concluded that these women would remain in the position. So that, yes, that would be something that the county could have elected in its discretionary authority to permit men who don't bring to the table an equal set of clerical administrative skills. But that was but one consideration with regard to these particular. Well, I don't know how I'm going to come out on the questions. You seem to be jettisoning the questions, even if that's true, so-and-so. But do you take the position that they are equally situated if there is a relatively easy way of training? Say the men have the jobs, no, women are trying to get it. If there's a skill that the person who wants the job can be trained for, are they equally situated under the law? If they can be trained? Yes. Similar being not exact, then I would say yes. If one can be easily trained, then I would concede that there would be a similar situation there with regard to the clerical and administrative skills, certainly. Thank you. Certainly. And if I could, I would like to as well, though, emphasize that it wasn't just those administrative and clerical skills that caused my client to, if you will, maintain or retain those particular individuals once they were, should I say, concluded with their training in the building inspector classification. These women were in the building department, now called developmental services, in an administrative clerical capacity. It is a primarily male-dominated classification, being building inspectors, primarily a field, type of occupation where you're going to different sites, be they residential or commercial. And initially the supervisor made, I believe, a legitimate and discretionary call that I'm going to train my newer building inspectors, which I think it's undisputed that these people, not only the two women, but the older gentleman, Mr. Fred McMorris, were new building inspectors. Weren't they paid less? They were paid less. They were less experienced in perhaps the geographical, if you will, layout on how to actually go about getting from point A to point B and carrying out their ultimate duties as building inspectors. And so I believe the record supported that our supervisor thought, oh, this would be a great opportunity, if you will, to introduce these newer building inspectors to what they're going to have to do. Once he got them into that, and I believe the record supports that this was a stopgap measure, by that statement I'm saying that he indicated that they ultimately were having the idea as management that we're going to put someone permanently in this position to prepare these inspection tickets. Well, why did the plaintiffs so anxious to get these jobs? That is perplexing as well to my client in that I think that there is no dispute in this case that, excuse me, appellants received overtime. And it wasn't based on the ---- Is this cushy overtime? Pardon me? Is this cushy overtime? I mean, do you get to work for 10 minutes and watch TV for 20 if you have this assignment? I saw some references that made it look like this may be ---- I mean, there's work and there's hard work. And this may qualify on the soft pillow end of the spectrum as far as they're concerned. And, again, I see that Justice Wallace sometimes takes issue with my saying even if. But I believe that core in this case is this issue of whether or not there truly is a legal entitlement to a specific overtime assignment. And I just don't see it anywhere in the case where appellants have shown that they were legally entitled to a specific overtime assignment. And the fact that they didn't get as much, perhaps, or the particular overtime assignment that they requested, I think the record actually supports that at least two of the appellants were off a significant amount of time due to their own, I don't know if it was work-related injuries or some sort of illness. And so that this period of time that's relevant in the case, you'll find that a couple of the appellants were actually outside of the workplace and could not even make themselves available to the overtime that was provided by the county. It is also our position that the similarly situated, going back to that question, we're talking about, again, trainee building inspectors with less experience as building inspectors. I think the record supports that Mr. Kennedy's clients, a couple of them were hired into the county as senior building inspectors, which means they came to the county with building inspection career lines or histories, and that all of the trainees, the individuals who they claim received favorable treatment, were new to performing this occupation altogether. The less experienced, they were earning less, and, again, they were within the protected class. These were over 40 individuals, although a couple of them were female. Basically, the bottom line is there was no disparate impact to the clients of Mr. Kennedy, based on their protected class of either being or not. There was no showing that there was any intent to treat them differently. There was no gender animus, not at all. I believe that one of his clients admits during deposition that he was never told that it was based at all upon him being a male. I think he admits that he was told that he needed special training, and that was the only reason that he could articulate that he recalled actually being told as to why he could not receive this particular overtime. Concerning the 42 U.S.C. 1983, it's the county's position that there was a failure by appellants to establish that there was a constitutional deprivation that caused injury. I'm assuming, because I wasn't really quite sure, that Mr. Kennedy's argument has to do with the decision by management to allow a particular overtime assignment at this desk was the conduct that would be in question. I'm not sure, again, that that's a constitutional right. As long as we're providing overtime in general, I'm not seeing a nexus necessarily between some sort of constitutional deprivation. Certainly, I don't think that he's established, again, any sort of animus based on gender or age in the county's response and that we're not allowing any of our, if you will, more experienced, not new building inspectors to have that particular assignment. And by the way, the record does support, I believe it was one of his clients stated during a deposition, that there was a more senior, more experienced female building inspector who requested overtime at this particular assignment, and she, too, was rejected. And I believe that that's because the legitimate articulated reason by management, given the efficiency and productivity and the new training opportunity for the new building inspectors, applied not just to males, but it applied to all experienced building inspectors in the department. And so that's why she, too, was denied the opportunity. Finally, with regard to the state law claim, it's the county's position that we've got two different orders here and that a couple of the appellant's cases was consolidated. And one of the cases, I believe it was Judge Dawson, he actually dismissed the state law tort claim basically saying, since I have exercised my jurisdiction in awarding summary judgment on your federal claims, with regard to your supplemental state law claims, I'm not going to even rule. I believe that the other judge actually found that our immunity argument under NRS 41032, wherein if you're exercising sort of discretionary-type functions, you have immunity with that. And we argue that the staffing decisions, assignment decisions, are all sort of, if you will, personal deliberation-type decisions that would cloak the county in immunity under NRS 41032, and that, therefore, the decision awarding summary judgment was appropriate and would ask respectfully that this court affirm. Thank you. I've got a few more minutes so I can take a few more punches. But to answer the question, I think, Your Honor, you hit it on the head. Why was this such an interesting, why did my clients want the morning overtime? It's easy money. It's all about money. Overtime is about money. And people in the county, when you're working on that pay grade, that time and a half really adds up. And that's the motivation to get to work the overtime is to make that money. And if you can make it sitting in the morning before the day starts, entering inspection tickets in and pick up an hour here, an hour there, get an extra four or five hours a week, it all adds up and make that house payment. So that's how it goes. But as far as the 1983 claim, I would, just to address counsel's concerns with it, if this court were to find that under Title VII there were a violation, then, of course, the 1983, I routinely file the 1983 claim in just about every Title VII action. I just sort of try and cover the basis. But if you find the constitutional deprivation is if you find a Title VII violation, that's my contention, then you also find a 1983 violation because that's a federal right. That's a constitutional right. There's certainly no constitutional right to overtime. And I don't think the founding fathers thought about that one. But there is a constitutional right not to face discrimination in the workplace, not to be discriminated. There's a constitutional right to what? There's no constitutional right to overtime, obviously. The constitutional deprivation would be if the court were to find a Title VII violation, were to find that there was unlawful discrimination. I believe that as a government worker you have a constitutional right not to be harassed or discriminated in your workplace. And that's the Supreme Court's decision. And what part of the Constitution or which amendment are you relying on? Well, the Due Process Clause, the 14th Amendment, I believe, as it applies to the states, I believe that one would be supportive of the fact that for every U.S. citizen, there is a right not to be discriminated against. I would submit on that. If there's any other questions. I have one other question. Do you believe that you've been able to show pretext as part of the prima facie case? The county's pretext is we did this to save money. And saving money is not an excuse for discrimination. We allege this was to save that. We did this the legitimate, non-discriminatory reason that the county is a county. I don't say it's an excuse for discrimination. I say it wasn't discrimination. We did it to save money. So it wasn't discrimination. They're not saying, yeah, we're not hiring any men because they cost more. They said, we're hiring the people the cheapest. They turn out to be women. That's not gender discrimination. Obviously, we take a different approach to it under Ellison v. Brady. We think if the motivation of the employer was to save money, that does not excuse what we contend was unlawful discrimination. So I'd submit on that. Thank you all very much. Thank you. Thank you. The case just argued is submitted to decision. We'll hear the next case, Perkins v. Postmaster General. This is Nevada Day. Good morning. May it please the Court. Jeffrey Dickerson. Good morning.
judges: Wallace, Schroeder, Clifton